1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,            )
                                     )
                        Plaintiff,   )       Case No.: 2:16-cr-00274-KJD-GWF
                                     )
vs.                                  )       **FINDINGS &**
                                     )       **RECOMMENDATIONS**
                                     )
LAZAREO JONES,                       )       **Re:  Motion to Suppress (ECF No. 19)**
                                     )
                        Defendant.   )
_____)

        This matter is before the Court on Defendant Lazareo Jones' Motion to Suppress Evidence
(ECF No. 19), filed on December 2, 2016.  The Government filed its Response (ECF No. 23) on
December 27, 2016 and Defendant filed his Reply (ECF No. 26) on January 5, 2017.  The Court
conducted an evidentiary hearing in this matter on January 30, 2017 and March 6, 2017.

## INTRODUCTION

        Defendant Lazareo Jones is charged with being a felon in possession of a firearm in violation
of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *Indictment* (ECF No. 9).  This charge arises out of the
search of an automobile on September 2, 2016 by United States probation officers during which two
hand guns were discovered.  Defendant argues that the search of the automobile violated his rights
under the Fourth Amendment and the evidence should be suppressed.  The Government argues that
Defendant did not have a reasonable expectation of privacy in the automobile and lacks standing to
challenge the search.  It also argues that the probation officers had reasonable suspicion to search the
automobile pursuant to the search clause in Defendant's conditions of supervision and therefore did
not violate the Fourth Amendment.  The Government alternatively argues that the evidence is

1   admissible under the "inevitable discovery doctrine."

2       The Court granted the Government's motion to limit the evidentiary hearing, initially, to the

3   issue of "standing." As the hearing progressed, it became evident that Defendant's alleged lack of

4   standing was not so clear-cut as to obviate the need for a hearing on the merits. The hearing was

5   therefore broadened to also receive evidence on the merits of Defendant's motion to suppress.

6   **BACKGROUND**

7       Defendant Jones previously pled guilty to a charge of felon in possession of a firearm in

8   United States v. Lazareo Jones, Case No.: 2:14-cr-140-APG-PAL. *Minutes of Proceedings* (ECF

9   No. 24). He was sentenced to a 30 months term of imprisonment, followed by three years of

10   supervised release. *Judgment* (ECF No. 28). The special conditions of Defendant's supervision

11   included the following search provision:

12           4) To ensure compliance with all conditions of release, you shall
        submit to the search of your person, and any property, residence,

13           business or automobile under your control by the probation officer, or
        any other authorized person under the immediate and personal

14           supervision of the probation officer without a search warrant at a
        reasonable time and in a reasonable manner. Provided, however, you

15           shall be required to submit to any search only if the probation officer
        has reasonable suspicion to believe you have violated a condition or

16           conditions of release. You shall also inform any other residents that
        the premises may be subject to a search pursuant to this condition.

17

18   *Judgment* (ECF No. 28), pg. 4.

19       Defendant's supervised release commenced on July 14, 2016. *See Request for Modifications*

20   *to Conditions of Supervision With Consent of Offender* (ECF No. 30). His conditions of supervision

21   were modified on July 20, 2016 to add the condition that he "be confined to home confinement with

22   location monitoring, if available for a period of 6 months." *Id.*

23       United States Probation Officer Steve Goldner testified that on August 29, 2016 at

24   approximately 2:02 A.M., the Probation Office received an alert regarding Defendant Jones's

25   electronic monitoring bracelet. The tampering alert meant that the strap had been broken from

26   Defendant's ankle. Officer Goldner became aware of the alert within one or two minutes after it

27   occurred. He telephoned Defendant Jones approximately six times between 2:00 A.M. and 4:00

28   A.M. He was not able to make telephone contact with the Defendant until about 4:00 or 4:30 A.M.

1   Officer Goldner went to Defendant's residence at 5336 Padero Drive at approximately 5:50 to 6:00

2   A.M.  Defendant was residing at that address with his mother and her husband.  Officer Goldner

3   testified that Defendant Jones was sitting on his front porch with several individuals when he arrived.

4   Defendant Jones was wearing red athletic shorts.  Officer Goldner testified that Defendant was

5   extremely intoxicated.  He conducted a breathalyzer test on Defendant Jones after smelling a strong

6   odor of alcohol on him.  The breathalyzer indicated that Defendant's breath alcohol content was .181

7   percent.  Defendant Jones stated that he had taken shots of hard liquor.

8           Defendant Jones told Officer Goldner that he had been engaging in horseplay with his child

9   and the child had inadvertently broken his ankle monitoring bracelet.  Officer Goldner testified that

10  he did not find this explanation to be credible.  First, it was the night (or morning) before the first

11  day of school.  Defendant's child was of elementary school age and the strap break had occurred at

12  about 2:00 A.M.  Second, the electronic monitoring bracelets are extremely difficult to break.  Officer

13  Goldner believed it would take the strength of a full grown individual to break the strap.  Defendant

14  Jones stated that he had not left the residence that night.  He also stated that his mother and her

15  husband no longer wanted him to reside with them.[1]

16          Officer Goldner testified that on the morning of August 29, 2016, he took an airplane flight to

17  St. Louis.  He was on the airplane when Detective Alex Ochoa of the North Las Vegas Police

18  Department contacted the U.S. Probation Office.  According to Officer Goldner,  "Ochoa said 'hey, I

19  heard about Mr. Jones being in a fight with this guy Dearcy Bell (sic) and he cut-off his bracelet.'"

20  After Officer Goldner landed in St. Louis, he was able to get in contact with Detective Ochoa.

21  Officer Goldner asked him to check to see if there were dispatch reports or other police reports

22  regarding any incidents at Defendant's residence on August 29, 2016.  Detective Ochoa obtained a

23  ─────────────

24          [1] Officer Goldner also testified that on August 31, 2016 at approximately midnight, the Probation Office
    received "unauthorized leave alerts" regarding Defendant Jones.  He stated that an unauthorized leave alert is
25  sent whenever the bracelet transmitter goes out of range of the receiver located in the monitored person's
    residence. The alert therefore indicated that Defendant left his residence which was a violation of his curfew.
26  According to the information provided by the system, Defendant Jones was away from his residence for
    approximately 30 minutes.  Mr. Jones claimed that he had gone outside to smoke a cigarette.  On September 1,
27  2016, Mr. Jones was also out of range of the receiver four times between midnight and 5:00 A.M.

28

computer assisted dispatch ("CAD") report regarding an incident at Defendant's residence on August 29, 2016 between 2:09 and 2:22 A.M. Defendant Ochoa also obtained information from a confidential source that Defendant Jones had been in fight with another individual in front of his residence in the early morning hours of August 29, 2016.

Detective Ochoa testified that he was contacted by Officer Steve Goldner on August 29, 2016 with respect to Defendant Jones. He recalled that Officer Goldner mentioned something about Defendant Jones's bracelet. Detective Ochoa knew who Defendant Jones was because of previous police contact with him. In response to Officer Goldner's inquiry, Detective Ochoa checked the CAD records to see if anything occurred at 5336 Padero Drive where Defendant Jones was residing on August 29, 2016. He ran the address information in the CAD system and received the report contained in *Government's Exhibit 1*. Detective Ochoa testified that he provided a copy of this report and a police report that he prepared to the United States Probation Office.

Detective Ochoa testified that the CAD report showed that at 2:09 A.M., a person called the police and reported "loud music" at 5336 Padero Drive. This person, or perhaps a subsequent caller, provided his or her name and telephone number. Detective Ochoa testified that, to his knowledge, the police did not follow-up with this caller to confirm the information that he or she had provided to dispatch. A second call came in at 2:21 A.M. The caller reported six subjects outside and stated that a neighbor went outside and a black male adult pulled out a firearm. The caller thought that the subject with the gun was wearing red shorts. Another call was received at 2:22 A.M. This caller reported loud subjects in the street. The subjects were arguing and a fight was possibly pending. The caller also reported that subjects were driving in a reckless manner through the area. The caller stated that "they" did not see a firearm, but that her husband had a firearm.[2]

Detective Ochoa prepared a written police report regarding the CAD report and additional information he obtained regarding the August 29th incident. *See Government's Exhibit 10.* Detective Ochoa reported that two North Las Vegas Police officers made contact with Defendant

---

[2] The CAD reports use police code numbers. 416 refers to a fight. 410 refers to reckless driving. 413 refers to firearm.

1   Jones' mother, Adell Jones, at 2:28 A.M. on August 29, 2016.  The officers reported that Adell Jones
2   appeared to be lying about what had taken place, but they did not report the details of what she said.
3   Detective Ochoa also stated in his report and testified that he received information from a
4   confidential source who wished to remain anonymous.  The confidential source stated that Defendant
5   Jones was involved in a fist fight with a person named Dearcy Bey on August 29, 2016.  The fight
6   occurred in front of Defendant Jones' residence some time after 2:00 A.M., but before 4:00 A.M.
7   Detective Ochoa testified that he had spoken to the confidential source on several occasions, and the
8   source had provided information about other individuals.  Detective Ochoa did not provide any
9   information about the confidential source to United States Probation Office other than what was
10  contained in his police report.  Officer Goldner also testified that he did not receive or request any
11  information from Detective Ochoa about the confidential source or his or her reliability.  The only
12  thing he knew about the confidential source was what Detective Ochoa stated in his report.

13          Although Detective Ochoa testified that he provided a copy of the CAD report and his police
14  report to the U.S. Probation Office, Officer Goldner testified that he never received the CAD report.
15  He did, however, receive Detective Ochoa's police report which summarized the information in the
16  CAD report and the information provided by the confidential source.  Officer Goldner also testified
17  that Detective Ochoa was mistaken in testifying that the Probation Office initiated contact with him
18  regarding the August 29, 2016 incident.  He reiterated that Detective Ochoa initially called the
19  Probation Office while he was on the airplane to St. Louis.

20          Officer Goldner testified that the information provided by Detective Ochoa regarding the
21  August 29, 2016 incident at 5336 Padero Drive corresponded with the tampering alert that was
22  received at 2:02 A.M. that same day.  He noted that the CAD report, according to the summary
23  provided by Detective Ochoa, stated that a black male adult wearing red shorts was seen with a gun.
24  When he met with Defendant Jones at approximately 6:00 A.M. that morning, Defendant was
25  wearing red shorts.  Officer Goldner took a photograph of the broken monitoring bracelet on April
26  29, 2016 in which Defendant's red shorts can be seen.  *Government's Exhibit 9.*

27          Officer Goldner testified that a new bracelet was installed on Defendant Jones on August 29,
28  2016.  Defendant was given permission to reside at a new residence because he was asked to leave

his mother's residence.  After he returned to Las Vegas, Officer Goldner reviewed all the information and began to put the pieces together.  He drafted a petition to revoke Defendant's supervised release on September 1, 2016.  He also requested permission to search Defendant Jones' residence.[3]

Officer Goldner testified that on September 1, 2016, the Chief Probationer Officer approved a search of Defendant Jones' new residence located at 5622 Via Victoria Ave., North Las Vegas, Nevada pursuant to the search provision in his special conditions of supervision.  Officer Goldner and other probation officers went to Defendant's residence on the morning of September 2, 2016 to arrest him and search his residence.  Prior to the search, Probation officers Donnette Johnson and Shawn Mummey parked their vehicle in the vicinity of Defendant's residence to conduct surveillance.  Officers Johnson and Mummey informed the other members of the search team that

---

[3] The Probation Office filed a petition for warrant for offender under supervision charging Defendant with violations of his conditions of supervision on September 1, 2016. Case No.: 2:14-cr-140-APG-PAL, *Petition* (ECF No. 31). The petition alleged that Defendant violated the following conditions of supervision:

(1) **Home confinement with Location Monitoring**. Defendant allegedly violated this condition by failing to return to his home within the approved curfew time on August 29, 2016; by tampering with the location monitoring equipment; by failing to respond to multiple calls from the probation officer; by providing false information regarding whether he had been involved in a fight outside his residence on August 29, 2016; and by leaving his residence without authorization on August 31, 2016 and September 1, 2016.

(2) **Refrain from Excessive Alcohol Use**. Defendant allegedly violated this condition on August 29, 2016 when the probation officer observed a strong odor of alcohol on Defendant; he admitted taking three shots of hard liquor; and a breath test showed that he registered 0.181% alcohol content. Defendant also allegedly violated this condition on July 25, 2016, when he smelled of alcohol and an alcohol breath test registered 0.056%.

(3) **Be Truthful**. Defendant allegedly violated this condition on August 29, 2016 when he falsely claimed that his son accidentally broke his electronic monitoring bracelet and that he did not leave the residence until the officer arrived to fix it.

(4) **Weapons Restriction**. The allegation that Defendant violated this condition was based on a police report that a person matching Defendant's description was in possession of a firearm during a street fight in front of Defendant's home on August 29, 2016.

(5) **Mental Health Treatment**. Defendant allegedly violated this condition by being under the influence of alcohol as alleged in count 2 and by failing to appear for a scheduled mental health treatment appointment on September 1, 2016.

1  they observed Defendant Jones exit his residence with a male child, proceed across the street, and

2  enter a 2014 Ford Mustang automobile.  Defendant then drove away.  Defendant returned alone to

3  the residential area approximately 30 minutes later.  He parked the vehicle in the same location and

4  re-entered his house.  Officers Johnson and Mummey both testified that Defendant Jones was

5  wearing blue shorts and was shirtless.  They did not observe any sign that Defendant had a gun on

6  his person when he left the residence with his son at approximately 8:15 A.M. or when he returned

7  alone at approximately 8:45 and went back into the residence.

8         Based on the information provided by Officers Mummey and Johnson, Officer Goldner was

9  aware that Defendant Jones returned to the residence at approximately 8:45 A.M.  Officer Goldner

10  and Probation Officer Ben Johnson knocked on the front door of the residence at 9:41 A.M.

11  Defendant opened the door and was immediately placed in handcuffs. Officer Goldner told him that

12  the search provision in his conditions of supervision was being invoked.  He searched Defendant's

13  person and removed the ignition key and remote control keyless entry device to the Ford Mustang

14  from Defendant's pocket.  Officer Goldner testified that prior to that morning he was not aware of

15  Defendant Jones driving a 2014 Ford Mustang.  The decision to search the Ford Mustang was based

16  on the officers' observation of Defendant using and being in control of the automobile that morning.

17  The purposes of searching the vehicle was to look for a firearm and evidence of Defendant's other

18  alleged violations of his supervised release, such as documents indicating that Defendant was away

19  from his residence at unauthorized times.  Officer Goldner stated that a receipt from Starbucks, for

20  example, might constitute such evidence.

21         Supervising U.S. Probation Officer Todd Fredlund participated in the September 2, 2016

22  search of Defendant's residence and the Ford Mustang.  Officer Fredlund was aware that Officers

23  Mummey and Johnson had established surveillance at Defendant's residence at approximately 8:13

24  A.M.  He was informed that Defendant Jones and a male child left the residence and entered a dark

25  grey Ford Mustang that was parked across the street.  Defendant was wearing shorts, but had no

26  shirt.  There was no indication that Defendant was carrying a firearm.  Defendant then drove out of

27  the neighborhood.  He thereafter returned in the Mustang, parked it in the same location and re-

28

1    entered his residence.[4]

2          Officer Fredlund testified that after Officer Goldner obtained the automobile key from

3    Defendant's pocket, he provided it to Supervising Officer Aquino who then provided it to Officer

4    Donnette Johnson.  Officer Johnson then delivered the key to Officer Fredlund.  Officer Fredlund

5    and Officer Johnson then went to the Ford Mustang.  Officer Fredlund testified that he opened the

6    driver's side door and immediately observed a handgun on the driver's side floorboard.  He testified

7    that he did not look through the car window before opening the door.  He did not touch the gun or

8    the driver's seat.  He used his cell phone camera to take a picture of the handgun on the floorboard at

9    approximately 9:50 to 9:52 A.M.  He emailed the photograph to Officer Goldner.  Officer Fredlund

10   testified that the photograph in *Defendant's Exhibit C* accurately depicts the handgun as he observed

11   it when he opened the car door.  *Defendant's Exhibit C* has a time stamp indicating that the

12   photograph was taken at 11:20 A.M.  Other photographs of the gun on the floorboard have time

13   stamps of 12:41 and 12:42 P. M.  *See Defendant's Exhibits D* and *E.*

14         Officer Fredlund testified that Probation Officer Symanski came to the vehicle and also took

15   photographs.  Officer Symanski opened the passenger side door and then opened the glove

16   compartment where he observed a second handgun.  Officer Fredlund testified that, to his

17   knowledge, no other officers touched anything inside the vehicle prior to it being turned over to the

18   FBI.  Officer Fredlund remained at the vehicle until it was turned over to the FBI agents at

19   approximately 11:00 A.M.

20         Officer Fredlund testified that it is not uncommon for supervised releasees to keep

21   contraband in their vehicles in an attempt to avoid it being found by probation officers during home

22   visits.  He routinely looks through the windows of a supervised releasee's vehicle for possible

23   contraband.  He testified that if the search clause had not been invoked on September 2, 2016, he

24   would have looked through the windows of the Ford Mustang and would have seen the handgun on

25   the floorboard.  Because Defendant was prohibited from possessing a firearm, such an observation

26   

27         [4] Officer Fredlund testified about his knowledge of the reasons why the search provision was invoked on
     September 2, 2016.  Because Officer Fredlund's knowledge was based on information provided by Officer
28   Goldner, his testimony on that matter is not set forth here.

1    would have been sufficient to invoke the search clause.  He acknowledged that the windows on the
2    Ford Mustang had a dark tint as shown in the photograph in *Defendant's Exhibit F*.  He nevertheless
3    stated that he would have been able to see the handgun on the floorboard by looking through the
4    driver's side window.  Officer Goldner also testified that it would have been possible to observe the
5    interior of the vehicle through the tinted windows.

6        Defendant's counsel asked Officer Fredlund to compare the photographs in *Government's*
7    *Exhibit 5* and *Defendant's Exhibit D*, and state whether the handgun was in a different position in
8    each photograph.  Officer Fredlund stated that the position of the handgun appeared to be different.
9    The photograph in *Government's Exhibit 5* is a magnified image.  The angle from which this
10   photograph was taken appears to be different from the angle of the photograph in *Defendant's*
11   *Exhibit D*.  The photograph in *Government's Exhibit 5* also appears to be distorted due to
12   magnification.  *Defendant's Exhibit E* is another image of the handgun on the floorboard which was
13   taken at about the same time as the photograph in *Defendant's Exhibit D*.  The photograph in
14   *Defendant's Exhibit E* shows the rear of the slide of the handgun which appears to touch a floor bolt.
15   This floor bolt is not depicted in the other two photographs.

16       Probation Officer Donnette Johnson testified that she observed Defendant Jones on
17   September 2, 2016 while conducting surveillance at his residence.  During the surveillance, she did
18   not observe anything indicating that Defendant was carrying a gun.  Officer Johnson observed
19   Defendant and his son enter the Ford Mustang vehicle.  She could not see them once they were
20   inside the vehicle due to the dark tinted windows.  She testified that she was standing next to Officer
21   Fredlund when he opened the driver's door and observed the handgun.  Officer Fredlund
22   immediately said "there it is" or words to that effect.  Officer Johnson did not look through the
23   window of the vehicle before Officer Fredlund opened the car door.  She indicated that from where
24   she was standing, she would not have been able to see inside the vehicle through the tinted windows.
25   She testified, however, that she might have been able to see inside through the window if she had
26   moved closer.

27       Officer Johnson testified that neither she nor Officer Fredlund touched anything inside the
28   vehicle.  They did not move the driver's seat.  Officer Johnson took pictures of the handgun on the

1   floorboard.  She also took pictures of the front and back of the vehicle, and the location where it was

2   parked.  She identified *Defendant's Exhibits G1, G2* and *G3* as photographs she took.  Officer

3   Johnson remained near the vehicle until the FBI arrived.  She testified that Probation Officer

4   Symanski opened the passenger side door and the glove compartment where he found the second

5   handgun.  No other officers entered the vehicle prior to the arrival of the FBI.

6       Following the entry into Defendant's house, Officer Goldner learned that three other

7   individuals were in the residence.  All three were convicted felons.  North Las Vegas police officers

8   spoke to these individuals.  Because none of the three individuals was arrested, Officer Goldner

9   inferred that they did not admit to possessing the Ford Mustang in which firearms were found.  The

10  police officers told him that the three individuals denied ownership of the firearms.

11      Detective Ochoa testified that the North Las Vegas Police Department assisted in the arrest of

12  Defendant Jones and the search of his residence on September 2, 2016.  He arrived at Defendant

13  Jones' residence at about 9:30 A.M.  Four or five other NLVPD officers were also present.  After the

14  firearms were found in the Ford Mustang, Detective Ochoa prepared an application for a search

15  warrant to search the Ford Mustang and seize the firearms and related items.  The search warrant also

16  authorized the officers to obtain a buccal swab from Defendant Jones.  *See Government's Exhibit 2*.

17  Detective Ochoa testified that the search warrant was issued by a North Las Vegas justice-of-the-

18  peace and the search was conducted by U.S. Probation officers and FBI agents.

19      Detective Ochoa testified that the three individuals in Defendant Jones' residence at the time

20  of the search were Jaquese Weathers, Antonio Richardson, and Rolando Williams.  He was familiar

21  with these individuals through previous police contact.  Detective Ochoa testified that Mr. Weathers

22  and Mr. Richardson denied knowing anything about the Ford Mustang.  Mr. Williams stated that the

23  vehicle belonged to one of "Lozareo's bitches."  Williams also posed the question: "Who had the key

24  when you guys came in through the door?"  Detective Ochoa testified that the three individuals

25  declined to provide DNA samples.  He stated that if they had done so, the samples would have been

26  compared to any DNA found on the handguns.

27      FBI Special Agent Colin Congo testified that following the discovery of the firearms, the

28  Ford Mustang was transported to the Las Vegas FBI office to be searched.  Keshawna Crenshaw

1    called the FBI office on September 2, 2016 regarding the automobile and came to the FBI office to

2    claim it.  Ms. Crenshaw stated that she was Rolando Williams' girlfriend.  She also referred to Mr.

3    Williams as her "baby-dad," i.e., the father of her child.  Ms. Crenshaw stated that she was the owner

4    of the Ford Mustang and that she had given Mr. Williams permission to drive it.  She did not give

5    anyone else permission to drive the automobile.  Ms. Crenshaw did not state, however, that she had

6    instructed Mr. Williams not to allow other persons to use the vehicle.  Agent Congo testified that a

7    temporary placard found in the glove box identified Ms. Crenshaw as the vehicle owner.

8    *Government's Exhibit 7* (photograph of placard).  An insurance document also identified her as the

9    insured owner.  *Government's Exhibit 8* (photograph of insurance document).  Agent Congo testified

10    that Ms. Crenshaw stated that Mr. Williams "gave" the vehicle to Defendant Jones to use for "some

11    hours."  The FBI released the vehicle to Ms. Crenshaw on September 2, 2016.

12         Agent Congo also testified that Defendant Jones spoke to FBI agent Joseph Roe on

13    September 2, 2016 after being given *Miranda* warnings.  Defendant Jones stated that he used the

14    Ford Mustang automobile that morning to take his son to school.  He also stated that the vehicle

15    belonged to Ms. Crenshaw.  Detective Ochoa was present during Defendant Jones' interview at the

16    FBI office.  He testified that Defendant Jones stated that the vehicle belonged to Rolando Williams'

17    girlfriend.  Defendant stated that he was confident that Mr. Williams would own up to what was his,

18    and that the officers should re-interview him.  Detective Ochoa further testified that on September 3,

19    2016, Las Vegas Metropolitan Police Department ("LVMPD") officers stopped the Ford Mustang

20    which was being driven by Rolando Williams.  Detective Ochoa spoke to Mr. Williams after this

21    stop.  Mr. Williams told him that "Zareo got caught slippin.  He better do his time like a man."

22         Ian Graham, an investigator with the Federal Public Defender's Office, testified that he made

23    contact with Keshawna Crenshaw on February 28, 2017 at the apartment complex where she was

24    now residing.  As Mr. Graham was walking toward Ms. Crenshaw's apartment, a grey Ford Mustang

25    passed him and parked across from Ms. Crenshaw's apartment.  A man and two women exited the

26    automobile and walked to Ms. Crenshaw's apartment.  Mr. Graham asked one of the women if Ms.

27    Crenshaw was available.  Ms. Crenshaw came to the door.  She then went with Mr. Graham to his

28    car to speak with him.  Ms. Crenshaw identified the Ford Mustang in the parking lot as her vehicle.

1    She stated that she purchased the vehicle shortly before the incident on September 2, 2016.  She

2    stated that she was the primary driver of the vehicle, but that her live-in boyfriend, Rolando

3    Williams, used it often.  She stated that she was aware that Lazareo Jones had borrowed the car on

4    September 2, 2016.  Ms. Crenshaw also told Mr. Graham that Mr. Williams had been arrested on

5    February 27, 2017 and was currently in the Clark County Detention Center.

6         Mr. Graham testified that he spoke to Rolando Williams at the detention center on February

7    28, 2017.  Mr. Williams stated that Ms. Crenshaw owned the vehicle and that he often used it.  He

8    used the automobile for a couple of days prior to driving it to Defendant Jones' residence on

9    September 1, 2016.  Mr. Williams stated that Mr. Weathers and Mr. Richardson were with him and

10    that they stayed overnight at Defendant Jones's residence.  On the morning of September 2, 2016,

11    Defendant Jones asked Mr. Williams if he could use the vehicle to take his son to school and Mr.

12    Williams gave him permission to do so.  Mr. Graham testified that he subsequently attempted to

13    serve a subpoena on Ms. Crenshaw and Mr. Williams to testify at the hearing, but was unable to do

14    so.  He later spoke to Ms. Crenshaw and Mr. Williams by telephone and they made clear that they

15    would not appear and testify at the hearing.

16                                   **DISCUSSION**

17    **A.    Defendant's "Standing" to Challenge the Search of the Ford Mustang.**

18         The Fourth Amendment to the United States Constitution protects "the right of the people to

19    be secure in their persons, houses, papers, and effect, against unreasonable searches and seizures."  It

20    further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or

21    affirmation, and particularly describing the place to be searched, and the persons or things to be

22    seized."

23         A criminal defendant may invoke the protections of the Fourth Amendment only if he can

24    show that he has a legitimate expectation of privacy in the place to be searched or the items to be

25    seized.  *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007) (citing *Smith v. Maryland*, 442

26    U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).  "The reasonable expectation of privacy turns

27    on (1) whether the person had 'an actual (subjective) expectation of privacy,' and (2) whether the

28    individual's subjective expectation of privacy is 'one that society is prepared to recognize as

1    reasonable.'" *United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013) (quoting *Katz v.*

2    *United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).  It is

3    defendant's burden to prove both elements. *Ziegler*, 474 F.3d at 1189 (citing *United States v.*

4    *Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005)).  The defendant is not necessarily required to

5    establish some sort of property interest.  "The 'capacity to claim the protection of the Fourth

6    Amendment depends not upon a property right in the invaded place,' but rather 'whether the

7    individual by his conduct has exhibited an actual (subjective) expectation of privacy,'" and whether

8    it is one that society is prepared to accept as reasonable. *Caymen*, 404 F.3d at 1199–1200 (citing

9    *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421 (1979) and *Smith v. Maryland*, 442 U.S. at 740, 99

10   S.Ct. 2577)).

11        A defendant, who claims that he had the permission of the owner or another authorized

12   person to use an automobile, must show that he had such permission at the time of the search.

13   *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006).  The evidence in this case, which is

14   mostly hearsay, shows that the Ford Mustang was owned by Keshawna Crenshaw and that her live-in

15   boyfriend, Rolando Williams, regularly drove the automobile with her permission.  Ms. Crenshaw

16   did not give any other person permission to use the automobile.  There is no evidence, however, that

17   she instructed Mr. Williams not to allow others to use it.  Although Mr. Williams did not admit

18   ownership or possession of the automobile when Detective Ochoa spoke to him on September 2,

19   2016, Ms. Crenshaw told the police that he was authorized to drive it, and he was stopped by the

20   police while driving the automobile the next day.  Mr. Williams also reportedly told Defendant's

21   investigator that he had given Defendant permission to use the automobile to drive his son to school

22   on September 2nd.  The evidence therefore supports the conclusion that Defendant Jones had valid

23   permission to use the Ford Mustang on the morning of September 2, 2016.

24        The parties have cited decisions in support of their respective positions on whether Defendant

25   had a reasonable expectation of privacy in the automobile.  Defendant relies on *United States v.*

26   *Portillo*, 633 F.2d 1313 (9th Cir. 1980), in which a police officer searched the trunk of an automobile

27   occupied by the defendants.  The officer found handguns, ammunition and other items allegedly

28   related to a robbery.  In reliance on *Rakas v. Illinois*, 439 U.S. 128, 143, 148-49, 99 S.Ct. 421, 433

1    (1979), the court held that the passenger did not have standing to challenge the search, but that the

2    driver did.  In holding that the driver had standing, the court stated:

3            Montellano, on the other hand, is very much in the same position as
             was the defendant in *Jones v. United States*, 362 U.S. 257, 80 S.Ct.
4            725, 4 L.Ed.2d 697 (1960).  As the Supreme Court pointed out in
             *Rakas*: 'Jones not only had permission to use the apartment of his
5            friend but had a key to the apartment with which he admitted himself
             on the day of the search and kept possessions in the apartment. Except
6            with respect to his friend, Jones had complete dominion and control
             over the apartment and could exclude others from it."  (citation
7            omitted).  Here, Montellano had both permission to use his friend's
             automobile and the keys to the ignition and trunk, with which he could
8            exclude all others, save his friend, the owner.  Montellano, therefore,
             possesses the requisite legitimate expectation of privacy necessary to
9            challenge the propriety of the search.

10    *Portillo,* 633 F.2d at 1317.

11            In *United States v. Perez*, 689 F.2d 1336 (9th Cir. 1982), also cited by Defendant, the

12    defendants hired the owner of a truck to transport heroin from Mexico into the United States.  The

13    defendants concealed the heroin in the truck's gas tank, and then closely followed the truck in

14    another vehicle after it crossed the border. The court held that the defendants had a reasonable

15    expectation of privacy in the truck because "there [was] every reason to infer that [defendants] would

16    have taken steps to exclude others who attempted to interfere with the contents of gas tank or

17    truck." *Id.* at 1338.

18            The Government relies on *United States v. Bouffard*, 917 F.2d 673 (1st Cir. 1990) and *United

19    States v. Soule*, 908 F.2d 1032 (1st Cir. 1990).  In *United States v. Bouffard*, the automobile owner

20    gave defendant permission to use the automobile until 5:00 P.M. that day.  The defendant did not

21    return the automobile as instructed.  The next day, the owner contacted the police and sought their

22    assistance in recovering the automobile.  The court held that the defendant lacked standing to

23    challenge the search based on the evidence that he had retained possession of the vehicle beyond the

24    bailment term, and that the bailor requested and received police assistance in recovering the vehicle.

25    917 F.2d at 676–77.  In *United States v. Soule*, a co-conspirator in a marijuana trafficking operation

26    drove his pick-up truck to the defendant's residence.  The defendant then drove the truck to a garage

27    at the rear of his house where marijuana was allegedly unloaded.  The co-conspirator thereafter drove

28    the truck away from the property whereupon it was stopped and searched by the police.  The court

held that the defendant did not have standing to challenge the search because he was nowhere near the truck when it was stopped and searched; he did not have any proprietary or possessory interest in the truck or its contents; and did not have any right to exclude others from the vehicle. The court stated that "it would be difficult to posit a clearer failure to demonstrate any legitimate expectation of privacy on the part of the defendant, either in the pick-up or its contents." 908 F.2d at 1036.

This case is distinguishable from *Portillo* because at the time Defendant Jones was confronted by the probation officers, he was no longer in Ford Mustang and had returned to his residence. The purpose for which he had borrowed the vehicle, to take his son to school, was also complete. He was, however, still in physical possession of the car keys. This case is also distinguishable from *Perez*, because Defendant Jones has not claimed any possessory interest in the contents of the automobile, including the guns. It differs from *Bouffard* because there is no evidence that Mr. Williams had terminated Defendant's permission to use the automobile before the probation officers seized the keys from him. Unlike *Soule*, Defendant was the last person to drive the automobile and was still in possession of the car keys when the probation officers took him into custody.

Although it is fairly debatable whether Defendant Jones had a legitimate expectation of privacy in the Ford Mustang at the time of search, based on all the circumstances the Court concludes that he did. The evidence shows that (1) Defendant received permission from Mr. Williams to use the automobile, (2) Defendant was observed driving the automobile approximately one hour before the search occurred, (3) he was still in possession of the car keys when the officers placed him in custody, and (4) there is no evidence that Defendant's permission to use the automobile had ended prior to the search.

**B.    Whether the Search Violated the Fourth Amendment**

The conditions of Defendant's supervised release authorized the probation officers to search his person, and any property, residence, business, or automobile under his control without a warrant subject to the following requirements: (1) The search must be conducted at a reasonable time and in a reasonable manner; and (2) the probation officer must have reasonable suspicion to believe the supervised releasee has violated a condition or conditions of release. *See Judgment* (ECF No. 28),

15

Case No.: 2:14-cr-140-APG-PAL.

In *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587 (2001), the police searched the defendant's apartment pursuant to a probation order that permitted any probation officer or law enforcement officer to search defendant's person, property, place of residence, vehicle, and personal effects at any time with or without a search warrant, arrest warrant, or reasonable cause. The lower court found that the police had reasonable suspicion to believe that defendant was engaged in criminal activity. In holding that the search did not violate the Fourth Amendment, the Supreme Court stated that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121, 122 S.Ct. at 593. *Knights* did not reach the issue of whether the search would have been lawful in the absence of reasonable suspicion. In *Samson v. California*, 547 U.S. 843, 126 S.Ct. 2193 (2006), the Court held that the search of a state parolee's body pursuant to a similar search clause, and in the absence of any reasonable suspicion, did not violate the Fourth Amendment. The Court noted that the privacy interest of a parolee or supervised releasee is generally less than that of a probationer. *Samson*, 547 U.S. at 850; *see also United States v. King*, 736 F.3d 805, 807 (9th Cir. 2013). Because the search condition in Defendant's judgment of conviction only authorizes a search if the probation officers have reasonable suspicion that he has violated his conditions of supervised release, this case is governed by *Knights*. The search was lawful so long as the probation officers had reasonable suspicion that Defendant had violated his conditions of supervised release or was engaged in criminal activity, and the search was directed at obtaining evidence of such conduct.

Defendant also raises the Ninth Circuit's *Motley/Howard* rule which provides that before conducting a warrantless search of a parolee's house pursuant to a search clause, law enforcement officers must have probable cause to believe that the parolee resides at the house. *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir. 2013) (citing *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) and *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc)). *Grandberry* indicates that the rule is limited to searches of a residence and does not apply to searches

16

of other property, including automobiles, that are under the parolee's control. The rule is predicated on the special protections that the Fourth Amendment accords to the home. *Id.* at 981–82. Even if the *Motley/Howard* rule applied, it would not invalidate the search of the Ford Mustang. The same facts that support Defendant Jones' standing to challenge the search, also support a probable cause finding that he was in control of the automobile immediately prior to the search. The probation officers observed Defendant Jones drive away and return in the automobile approximately one hour before the initiation of the search. No one else operated or occupied the vehicle between the time Defendant returned to his residence and the officers made entry into the residence and took the automobile key from Defendant's pocket.[5]

The decision on this motion therefore turns on whether the probation officers had reasonable suspicion that Defendant had violated his conditions of supervision to justify a search of his residence and the Ford Mustang. The meaning of "reasonable suspicion" is not precise. In *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 1585 (1989), the Supreme Court stated:

> The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra*, 462 U.S. at 232, 103 S.Ct., at 2329. We think the Court of Appeals' effort to refine and elaborate the requirements of "reasonable suspicion" in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As we said in *Cortez*:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common–sense conclusions about human behavior; jurors are fact–finders are permitted to do the same—so are law enforcement officers. *Id.*, at 418 101 S.Ct. at 695.

---

[5] During the hearing, Defendant's counsel asserted that after Defendant was arrested, he was no longer on supervised release and, therefore, was not subject to the search condition. The Court rejects this assertion. The petition for warrant for offender under supervision did not revoke Defendant's supervised release. Defendant's supervised release could only be revoked following a hearing conducted in accordance with Rule 32.1(b)(2) of the Federal Rules of Criminal Procedure and 18 U.S.C. §3583(e). There is no legal basis to conclude that a search pursuant to the defendant's conditions of supervised release may not be conducted contemporaneously with or shortly after the defendant is taken into custody on an arrest warrant.

1    In *Navarette v. California*, — U.S. —, 134 S.Ct. 1683,1687 (2014), the Court stated that

2    reasonable suspicion is dependent upon both the content of the information possessed by the police

3    and its degree of reliability.  The standard takes into account the totality of the circumstances in

4    which the whole picture is considered.  Although a mere hunch does not create reasonable suspicion,

5    the suspicion required is considerably less than proof of wrongdoing by a preponderance of the

6    evidence, and less than is required for probable cause.

7    The Supreme Court and Ninth Circuit have considered the extent to which information

8    provided by anonymous tipsters or 911 callers can provide reasonable suspicion to believe that an

9    individual is engaged in criminal activity.  In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375 (2000),

10   the Supreme Court held that a call to the police from an anonymous tipster that "a young black male

11   standing at a particular bus stop and wearing a plaid shirt was carrying a gun," did not provide

12   reasonable suspicion to believe that the defendant, who was at the location and matched the

13   description, was carrying a concealed handgun.  The Court stated that "[a]ll the police had to go on

14   in this case was the bare report of an unknown, unaccountable informant who neither explained how

15   he knew about the gun or supplied any basis for believing he had inside information about J.L." *Id.*,

16   529 U.S. at 271, 120 S.Ct. at 1379.

17   In *Navarette*, however, the majority held that law enforcement officers lawfully stopped the

18   defendant's truck based on reasonable suspicion of drunk driving arising from an anonymous 911

19   caller's report that her vehicle had been run off the road by a truck which then headed south on the

20   highway.  134 S.Ct. at 1688–91.  The caller's description of the truck matched the defendant's

21   vehicle which the police located in the area where the caller said it was headed.  The Court

22   distinguished *Florida v. J.L.* on the grounds that because an emergency call to 911 can be recorded

23   and the number traced, it provides a greater indicia of reliability than a purely anonymous tip

24   provided to the police.  *Id.*  The Court also stated that the 911 call provided a greater degree of

25   reliability because the caller reported an event that she had just witnessed and was the victim of. *Id.*

26   In *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004), the Ninth Circuit anticipated

27   *Navarette* in holding that the police had reasonable suspicion to stop and frisk the defendant based

28   solely on information provided by a 911 caller.  The caller, who identified himself as "Jose

18

1    Domingis," stated that three minutes earlier a man had threatened him with a .45 handgun.   The

2    caller provided the location of the incident and described the suspect as a twenty-year old Hispanic

3    male, attired like a gang member, with a hat, white and blue jersey, brown jacket and back pack.   The

4    police went to the location provided by the caller where they observed the defendant who matched

5    the suspect's description.   The court stated that because the 911 caller was not anonymous, his report

6    was more reliable than the anonymous tipster in *Florida v. J.L.*   The court also noted that 911 calls

7    are recorded and can be verified.   The caller also reported a contemporaneous emergency event that

8    he witnessed first hand and for which he sought immediate police assistance.   All of these factors

9    added to the call's reliability and supported the finding of reasonable suspicion.

10       In *United States v. Edwards*, 761 F.3d 977 (9th Cir. 2014), the court followed *Navarette* and

11   *Terry-Crespo* in holding that the police had reasonable suspicion to detain the defendant based on an

12   anonymous 911 call.   The 911 caller reported to the dispatcher that a young black male, 19 to 20

13   years old, 5'7" to 5'9" in height, and wearing a black shirt and grey pants was shooting at passing cars

14   at an intersection.   The police went to the intersection where they observed the defendant who

15   matched most of the particulars of the description.   The officers frisked defendant and discovered a

16   handgun on his person.   The court stated that in light of *Navarette*, the anonymous 911 call exhibited

17   sufficient indicia of reliability to provide the officers with reasonable suspicion.   The call concerned

18   an emergency and dangerous situation.   The caller was an eyewitness to the shooting and was able to

19   provide details about what had occurred.   The court also noted that the ability of the police to trace

20   911 calls makes them more reliable than a purely anonymous tip.   *Id*. at 984–85.

21       In this case, the CAD Report, *Government's Exhibit 1*, and Detective Ochoa's testimony

22   show that an initial call was received by dispatch at 2:09:56 A.M. That caller reported loud music at

23   5336 Padero Drive.   This may have been the caller who provided his/her name and telephone

24   number.   A second call was received at 2:21:24.   This caller reported six subjects fighting outside,

25   and that a neighbor went outside and a black male adult pulled out a firearm.   The caller thought that

26   the subject with a gun was wearing red shorts.   The report states at 2:22:03:   "2nd PR was calling

27   from [redacted]."   Another call was received at 2:22:05, possibly from a third caller.   This caller

28   reported loud subjects in the street; the subjects were arguing and a fight was possibly pending.   The

1  caller also reported that subjects were driving through the area in a reckless manner.  This caller did

2  not see a gun, but stated that her husband had a gun and possibly indicated that he was outside the

3  residence.  Police officers arrived at the incident scene at 2:28 A.M. and spoke with Defendant's

4  mother, but did not see Defendant.

5       If the police officers had located Defendant at or near 5336 Padero Drive at 2:28 A.M. on

6  August 29, 2016 and observed him wearing red shorts, they arguably would have had reasonable

7  suspicion to pat him down for a weapon based on the information received by dispatch.  Although it

8  is unknown whether the caller who provided his or her name and phone number was the same person

9  who reported the black male adult with a firearm, *Navarette* and *Edwards* do not preclude the

10 reliability of an anonymous 911 caller under similar circumstances.  The descriptions of the suspect

11 with a firearm was not as detailed, however, as that provided by the callers in *Terry-Crespo*,

12 *Navarette* and *Edwards*.  Nor was it clear from where the caller observed the suspect.  Defendant, of

13 course, was not contacted by the officers who responded to the incident.

14      The information subsequently obtained by Probation Officer Goldner, together with the CAD

15 report information that was communicated to him by Detective Ochoa, provided Officer Goldner

16 with reasonable suspicion to believe that Defendant was in possession of a firearm at or about 2:21

17 A.M. on August 29, 2016.  It also provided reasonable suspicion to believe that he continued to be in

18 possession of a firearm after that time.  First, it is relevant that at the time of the August 29, 2016

19 incident, Defendant was on supervised release for a 2014 conviction for a prohibited person in

20 possession of a firearm in violation of 18 U.S.C. § 922(g)(9) and 924(a)(2).  *See United States v.*

21 *Nora*, 765 F.3d 1049, 1059 (9th Cir. 2014) ("We have stated that criminal history 'can be helpful in

22 establishing probable cause, especially where the previous arrest or conviction involves a crime of

23 the same general nature as the one the warrant is seeking to uncover.'").  Defendant was released

24 from the Bureau of Prisons and had begun his supervised release on July 14, 2016.  Shortly

25 thereafter, he violated the conditions of his supervised release which resulted in him being placed on

26

27

28

20

1   home confinement with electronic monitoring.[6]  This history would suggest that Defendant might be

2   more likely than others to possess a firearm, and to not abide by his conditions of supervision.

3   Second, the Probation Office received a tamper alert regarding Defendant's electronic bracelet at

4   2:02 A.M. on August 29th.  Officer Goldner telephoned Defendant's residence several times after the

5   alert was received, but was not able to make telephone contact with him until 4:00 to 4:30 A.M.

6   When Officer Goldner met with Defendant at 6:00 A.M., he provided the highly doubtful

7   explanation that the electronic monitoring bracelet broke during horseplay with his son.  These

8   circumstances were sufficient, in themselves, to place Officer Goldner on reasonable suspicion that

9   Defendant had violated his conditions of supervision and had potentially engaged in unlawful

10  conduct between 2:02 A.M. and 4:00 or 4:30 A.M.  Officer Goldner subsequently received the

11  information about the calls to police dispatch which began only a few minutes after the bracelet

12  tamper alert.  These reports were consistent with the suspicion that Defendant had either

13  intentionally removed the bracelet or that the bracelet was broken during a fight outside his

14  residence.  Finally, of course, was the report that a black male adult wearing red shorts was seen with

15  a gun.  When Officer Goldner saw Defendant at 6:00 A.M. that morning, he was wearing red shorts.

16  All of these circumstances, taken together, were sufficient to provide Officer Goldner with

17  reasonable suspicion to believe that Defendant was in physical possession of a firearm at

18  approximately 2:21 A.M. on August 29, 2016 and that he would still have a firearm in his possession

19  on September 2, 2016.

20       Because the probation officers had reasonable suspicion to believe that Defendant was in

21  possession of a firearm on the basis of the foregoing information, it is unnecessary to consider

22  whether the anonymous tip from Detective Ochoa's informant also supported reasonable suspicion.

23  The informant's tip, however, lacks the indicia of reliability that the calls to dispatch had.  Although

24

25       [6] According to the request for modification filed on July 20, 2016, Officer Goldner alleged that
26  Defendant hosted a party at a local hotel-casino on July 19, 2016 which was attended by several known
    prostitutes and pimps.  Defendant was subsequently present at a bar where a fight erupted and several individuals
27  reportedly brandished firearms.  Defendant was photographed and recorded on video at the bar associating with
    at least 7 known gang members.  *Request for Modification of Conditions* (ECF No. 29), Case No. 2:14-cr-00140-
28  APG-PAL.

1   the identity of the informant was probably known to Detective Ochoa, he wished to remain

2   anonymous which detracts from the reliability of any information he provided.  The informant stated

3   that Defendant was in a fight that occurred between 2:00 A.M. and 4:00 A.M. which indicates that

4   the informant did not personally witness the fight.  The source of the informant's information is

5   otherwise unknown.  The confidential informant's report was not sufficient, in itself, to provide

6   reasonable suspicion that Defendant violated his conditions of supervision.[7]

7          It is not unusual for individuals to store firearms in their automobiles, or for persons who are

8   engaged in criminal activity, or prohibited from possessing firearms, to hide them in their

9   automobiles as well as in their residences.  The probation officers observed Defendant drive the Ford

10  Mustang on the morning of September 2, 2016 and they found him in possession of the keys when

11  they took him into custody.  They therefore had reasonable suspicion to search the automobile for a

12  firearm, as well as for other evidence that Defendant had violated his conditions of supervised

13  release.  The search of the Ford Mustang did not violate Defendant's Fourth Amendment rights.

14          **C.    Inevitable Discovery Doctrine.**

15          The Government argues that even if the probation officers did not have reasonable suspicion

16  to search Defendant's residence prior to arriving there on September 2, 2016, they would have

17  inevitably discovered the guns in the routine course of executing the warrant for Defendant's arrest.

18  In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 2511 (1984), the Supreme Court stated that "if the

19  government can prove that the evidence would have been obtained inevitably and, therefore, would

20  have been admitted regardless of any overreaching by the police, there is no rational basis to keep

21  that evidence from the jury in order to ensure the fairness of the trial proceedings."  The inevitable

22  discovery doctrine requires that "'the fact or likelihood that makes the discovery inevitable arise

23  from circumstances other than those disclosed by the illegal search itself.'" *United States v. Ramirez-*

24  *Sandoval*, 872 F.2d 1392, 1396 (9th Cir.1989) (quoting *United States v. Boatwright*, 822 F.2d 862,

25  864–65 (9th Cir. 1987)).  The government can meet its burden by showing that, by following

26

27          [7] Because the motion can be decided without reliance on the confidential informant's information,
28  disclosure of his or her identity is not required.

22

1    procedures, the police would have inevitably uncovered the evidence.  *Id.* at 1399; *United States v.*

2    *Lopez-Soto*, 205 F.3d 1101, 1107 (9th Cir. 2000).

3         Probation Officer Fredlund testified that it is the routine practice of probation officers in

4    conducting visits at supervised releasees' residences to look into the windows of their parked

5    automobiles to see if any contraband is in plain view.  Although Officer Fredlund did not look

6    through the window of the Ford Mustang before opening the door, he testified that he would have

7    been able to see the gun on floorboard if he had done so.[8]  The Government argues that because the

8    probation officers would have looked in the Ford Mustang's windows as part of their routine

9    procedure, the gun on the floorboard would have been observed, which, in turn, would have provided

10   the officers with a lawful basis to search the automobile.  Defendant argues, however, that the

11   probation officers would not have been able to see the gun the on floorboard through the dark tinted

12   windows.  Defendant also asserts that the gun may have been moved from beneath the driver's seat

13   before the photographs were taken and would not have been as visible as the photographs indicate.

14        The Court does not doubt the sincerity of Officers Fredlund's and Goldner's belief that the

15   gun could have been seen by looking through the driver's side window.  Neither of them, however,

16   actually observed the gun through the window either before or after the gun was discovered.  The

17   windows on the Ford Mustang were darkly tinted.  *See Defendant's Exhibit F.*  The photographs

18   indicate that the gun and the floorboard carpet were of similar color and shade.  *Defendant's Exhibit*

19   *D, Government's Exhibit 5.*  Although photographs do not necessarily depict what can be seen with

20   the actual eye, the Court is not persuaded that the gun could have been seen if the probation officers

21   had looked through the automobile window.  The Government has therefore not proven by a

22   preponderance of the evidence that the firearms would have been discovered if the search clause had

23   not been invoked.

### CONCLUSION

25        Defendant Jones had a legitimate expectation of privacy in the Ford Mustang automobile at

---

27   [8] Officer Goldner also testified that the gun could have been seen by looking through the driver's side
     window.  Officer Johnson was less certain whether the gun could have been observed by looking through the

28   automobile's window.

1    the time of the search and therefore has standing to challenge the legality of the search under the

2    Fourth Amendment.  The probation officers had reasonable suspicion to believe that Defendant was

3    in possession of a firearm and had violated the conditions of his supervised release to invoke the

4    search clause in his conditions of supervision and search his residence on September 2, 2016.

5    Because the officers observed Defendant operating the Ford Mustang a short time before they made

6    entry into his residence, and Defendant still had physical possession of the car key, the officers also

7    had reasonable suspicion to search the automobile for a firearm or other evidence that Defendant had

8    violated his conditions of supervised release.  The Government has not proven, however, that the

9    firearms would have been inevitably discovered without first conducting a search of the automobile.

10   Accordingly,

11                               **RECOMMENDATION**

12        **IT IS RECOMMENDED** that Defendant's  Motion to Suppress Evidence (ECF No. 19) be

13   **denied**.

14                                  **NOTICE**

15        Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

16   writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held

17   that the courts of appeal may determine that an appeal has been waived due to the failure to file

18   objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also

19   held that (1) failure to file objections within the specified time and (2) failure to properly address and

20   brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

21   factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.

22   1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

23        DATED this 3rd day of April, 2017.

24

25                               _____
                                 GEORGE FOLEY, JR
                                 United States Magistrate Judge

26

27

28

                                        24